## STATE OF CONNECTICUT *v.* MARCOS AVILES
### (AC 28454)

Flynn, C. J., and Bishop and Beach, Js.

Argued January 22—officially released April 22, 2008

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly* and *Gail P. Hardy*, state's attorneys, for the appellee (state).

*Opinion*

FLYNN, C. J. The defendant, Marcos Aviles, appeals from the judgment of conviction, rendered after a jury trial, of one count of murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant claims that (1) probable cause was not established with adequate proof, and, therefore, the trial court's finding of probable cause was improper, (2) the evidence of intent was insufficient to sustain the defendant's conviction,

and, therefore, the court improperly denied his motion for a judgment of acquittal, (3) his written confession was involuntary and was not a verbatim record of his oral statement, and, therefore, the court violated his due process rights by denying his motion to suppress the statement, and (4) the court's instructions to the jury on the element of intent were contradictory and confusing and, therefore, in violation of the defendant's constitutional rights. We affirm the judgment of the trial court.

The following facts reasonably could have been found by the jury. On March 31, 2003, the defendant and his girlfriend, Lydia Velazquez (Velazquez), went to Congress Avenue in Waterbury to purchase marijuana. They approached the victim, Patrick Kelleher, also known as "Computer Boy," and gave him $20 for a bag of marijuana. The victim took the money and went into 116 Congress Avenue, but he did not return with the marijuana. At the direction of the defendant, Velazquez went to the door of 116 Congress Avenue. When she returned to the defendant's vehicle, she informed him that the victim had sworn at her and had slammed the door in her face. The defendant became angry and drove Velazquez to his apartment on East Liberty Street, where he retrieved a .45 caliber pistol. The defendant then returned to 116 Congress Avenue, knocked on the door and confronted the victim. The defendant and the victim argued briefly, while the defendant pointed his pistol at the victim. Finally, the victim told the defendant: "Shut the f___ up, I don't give a f___." The victim then slammed the door. The defendant fired two gunshots into the door, just below the eye level peephole. One of the bullets missed the victim, but the other struck the victim's chest, severing his aorta and killing him almost immediately.

The defendant fled the scene, returned to his apartment and asked Velazquez to drive him to his cousin's

house at 60 Jewelry Street, where he deposited the pistol in the trunk of a greenish blue Plymouth Sundance. After returning to his vehicle, the defendant admitted to Velazquez that he had shot "the white kid who burned him for $20."

The next day, when Velazquez' sister, Rosalie Velazquez (Rosalie), went to the defendant's apartment, she noticed that the defendant was very nervous. When she questioned him about this, the defendant admitted to her that he had shot a man who had "burned" him for $20 on Congress Avenue because he felt disrespected. He also stated that he thought he might have killed the man. Shortly after Rosalie left the defendant's apartment, the defendant telephoned her, asking if she would find out if the victim had been killed. She read a newspaper and informed the defendant that the victim, indeed, had been killed. The defendant stated that he needed to get out of town, and he had a friend, Angel Rodriguez, drive him and Velazquez to the home of Velazquez' parents in Willimantic. When Rodriguez returned to Waterbury, he told Rosalie where he had taken the defendant and Velazquez. Fearing for her parents' safety, Rosalie telephoned the Waterbury police department.

The police went to the parents' apartment in Williamantic and arrested Velazquez on an outstanding warrant unrelated to this case. At the same time, they asked the defendant to accompany them to the Waterbury police station for questioning. The defendant agreed, was handcuffed and was taken to the police station in a vehicle separate from Velazquez. Once at the police station, the defendant initially denied any involvement in the killing of the victim. After the defendant was told that others had implicated him in the killing, he asked to see a photograph of the victim. The defendant then was shown a photograph of the victim's dead body, after which he broke down, began to cry

and stated that he "didn't mean to kill him." The defendant was advised of his rights and signed a sworn statement admitting that he was responsible for the victim's death. He was charged with murder, tried before the jury and convicted. The court sentenced the defendant to a term of fifty-seven years imprisonment. This appeal followed.

I

The defendant first claims that the court's finding of probable cause was improper because the state had not established sufficiently the necessary element of intent. He argues that the state presented only one witness at the probable cause hearing, Sergeant David Jannetty, the lead detective on the case, who testified that the defendant repeatedly stated that he did not mean to kill the victim. The only other evidence introduced at the hearing, he argues, was the defendant's confession and the autopsy report. The defendant further argues that this evidence did not establish the necessary element of intent to commit murder. The state responds that the facts of the case provide more than sufficient circumstantial evidence that the defendant intended to kill the victim. We agree with the state.

"On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the [court's] decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We do not examine the record to determine whether the trier of fact could have

reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Citation omitted; internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 598, 682 A.2d 972 (1996). "The probable cause determination requires a common sense view of the facts." *State* v. *Patterson*, 213 Conn. 708, 722, 570 A.2d 174 (1990).

"It is well established that, [a]lthough it must transcend mere speculation, the evidentiary standard for probable cause is, of course, less demanding than that which is required to sustain a conviction at trial. . . . Viewing the proffered proof most favorably to the state, the court must decide whether the state's evidence would warrant a person of reasonable caution to believe that the respondent had committed the crime with which he was charged. . . . In [a] case [in which] the state [is] required to establish probable cause to believe that the defendant was guilty of intentional murder in violation of § 53a-54a, the elements . . . are intent and causation." (Citations omitted; internal quotation marks omitted.) *State* v. *Newsome*, supra, 238 Conn. 597–98.

Here, the defendant claims that there was not sufficient evidence to warrant a finding of probable cause that he *intended* to kill the victim. We do not agree.

"Generally, intent can be proved only by circumstantial evidence. . . . Intent may be, and usually is, inferred from conduct. . . . Intention is a mental process, and of necessity it must be proved by the statements or actions of the person whose act is being scrutinized. . . . An intent to cause death may be inferred from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and

immediately following the death. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available." (Citations omitted; internal quotation marks omitted.) *State* v. *Patterson,* supra, 213 Conn. 721–22. "Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Internal quotation marks omitted.) *State* v. *Stanley,* 223 Conn. 674, 679, 613 A.2d 788 (1992).

In this case, the evidence presented at the probable cause hearing established that the victim had "burned" the defendant for $20, sworn at the defendant's girlfriend and slammed the door in her face. In response to these events, the defendant brought his girlfriend back to his apartment and retrieved a .45 caliber pistol. Armed with this pistol, the defendant returned to the apartment located at 116 Congress Avenue and went to the door. After words were exchanged between the defendant and the victim, the victim slammed the door closed on the defendant, and the defendant fired two gunshots into the door just below the peephole. From this evidence alone, we conclude that the court reasonably could have found that there was probable cause to believe that at the moment the defendant shot into the closed door, he had the intent to kill the victim.

## II

The defendant next claims that the court improperly denied his motion for a judgment of acquittal where the evidence of intent was insufficient to sustain his conviction of murder beyond a reasonable doubt. He argues that if he had the necessary intent to kill the victim, he would have shot the victim as soon as the door was opened and would not have waited until the solid wooden door was closed, leaving him unable to

see the victim or precisely where he was standing. We do not agree.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Martin*, 285 Conn. 135, 147–48, 939 A.2d 524 (2008).

To establish a violation of § 53a-54a, the crime of murder, the state must prove beyond a reasonable doubt that the defendant, "with intent to cause the death of another person . . . cause[d] the death of such person or of a third person . . . ." General Statutes § 53a-54a (a). "[T]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. . . . Because direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct. . . . In addition, intent to kill may be inferred from evidence that the defendant had a motive to kill." (Citations omitted; internal quotation marks omitted.) *State* v. *Gary*, 273 Conn. 393, 406–407, 869 A.2d 1236 (2005). Our law also

provides that "the defendant's state of mind at the time of the shooting may be proven by his conduct before, during and after the shooting. Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state." (Internal quotation marks omitted.) *State* v. *McCoy*, 91 Conn. App. 1, 7, 879 A.2d 534, cert. denied, 276 Conn. 904, 884 A.2d 1026 (2005).

In this case, the defendant concedes that "the evidence is sufficient to establish that [he] caused the death of the victim. However, [he argues that] there is no evidence establishing that [he] intended to cause the death of the victim." The defendant further contends that "[t]his is a classic reckless manslaughter case, which the state has improperly tried to bootstrap into an intentional murder." A review of the record leads us to the conclusion that there was sufficient evidence for the jury to have found that the defendant intended to kill the victim and that the defendant was guilty of murder beyond a reasonable doubt.

The jury had before it evidence that the angry defendant went back to 116 Congress Avenue, after retrieving a loaded .45 caliber pistol, to confront the victim because the victim had "burned" the defendant for $20, had not given him the promised marijuana, had sworn at Velazquez, the defendant's girlfriend, and had slammed a door in her face. The defendant and the victim then argued, the victim swore at the defendant and the victim slammed the door on the defendant. In response, the defendant fired two gunshots into the door, just below the eye level peephole, one of which struck and killed the victim. After the shooting, the defendant fled the scene and hid the gun in the trunk of someone else's vehicle. He also admitted to Velazquez that he had shot the victim. The next day, the defendant

admitted to Rosalie that, because he had felt disrespected, he shot the victim, whom he thought might be dead.

Although the defendant argues that intent was not proven in this case because he had told the arresting officers that he did not mean to kill the victim, a review of the above referenced evidence, which provided facts about the defendant's conduct before, during and after the murder, confirms that the jury reasonably could have found, beyond a reasonable doubt, that the defendant intended to kill the victim. "[T]he defendant's state of mind at the time of the shooting may be proven by his conduct before, during and after the shooting. Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state." (Internal quotation marks omitted.) *State* v. *McCoy*, supra, 91 Conn. App. 7.

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the evidence was sufficient for the jury to have concluded, beyond a reasonable doubt, that the defendant had formed the specific intent to kill the victim.

### III

The defendant claims that the court violated his due process rights by denying his motion to suppress his written statement where the written statement was involuntary and was not a verbatim record of his oral statement. The defendant does not challenge the court's finding that the statement was taken, printed and read in its entirety to the defendant in English and also was read to him in Spanish. Rather, the defendant argues that the court improperly denied his motion to suppress where "the trial court found as a fact that the defendant [had] signed a confession he could not read, which was not a verbatim written record of his statement, but only

summarized his statement 'in substance.' Yet the trial court . . . acknowledged that the police had made a critical omission—they neglected to include the defendant's statement that he had not meant to kill the victim." The defendant also claims that he was subjected to a "coercive atmosphere . . . ." The state argues that "the trial court [properly] found that the written document accurately characterized the substance of the defendant's statement . . . that the defendant spoke English and that his statement was given knowingly, intelligently and voluntarily." (Citations omitted.) We agree with the state.

"The principles governing our review of the trial court's ruling are well established. [T]he use of an involuntary confession in a criminal trial is a violation of due process. . . . The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . [whether] the confession [was] the product of an essentially free and unconstrained choice by its maker . . . . If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . The determination, by the trial court, whether a confession is voluntary must be grounded upon a consideration of the circumstances surrounding it. . . .

"Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the

questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . .

"To begin, we note the established rule that [t]he trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . .

"[A]lthough we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. . . . Consistent with the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record. . . . Accordingly, we conduct a plenary review of the record in order to make an independent determination of voluntariness." (Citation omitted; internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 153–54, 920 A.2d 236 (2007).

After a hearing on the motion to suppress, the court made the following relevant factual findings: "On April 3, 2003, members of the Waterbury police department traveled to Willimantic . . . to find the defendant . . . to question him regarding the shooting of . . . Kelleher in Waterbury on March 31, 2003. The Waterbury police department, with the assistance of the Willimantic police department, located [the defendant] at the home of a family member of Lydia Velazquez, the defendant's girlfriend. . . . The officers . . . conversed with [the defendant] in English for several minutes. [The defendant] spoke English to the officers and voluntarily agreed to return to Waterbury. At this point, the defendant was handcuffed and placed into the backseat of a police cruiser. During the duration of the ride back

to Waterbury, [the defendant] sat between two officers and did not speak . . . .

"Shortly after his arrival at the Waterbury police department, [the defendant] was orally advised of his constitutional rights in English by Sergeant Eugene Coyle. The defendant, who has a ninth grade education, stated, and the court finds, that he could speak English and understands spoken English, but can read and write in Spanish only. [The defendant] was also given an opportunity to read the *Miranda* rights[1] in Spanish. He agreed to answer questions and did not request the assistance of a lawyer. He denied any involvement in or knowledge of the death of . . . Kelleher. Sergeant Coyle subsequently left the room.

"Two Waterbury police officers, Detectives Jannetty and David Balnis . . . entered the interview room at approximately 1:30 a.m. on April 4, 2003. The defendant was orally readvised of his *Miranda* rights in English and also shown in Spanish written *Miranda* warnings contained on an advisement card. State's exhibit number two. The defendant signed and dated the card and in English acknowledged that he understood his constitutional rights. In English, he agreed to answer questions and again denied any involvement in or knowledge of the death of Patrick Kelleher.

"The defendant was then told [that] several other parties, including his girlfriend, who had been taken into custody on an unrelated felony warrant, had implicated him in the murder of Patrick Kelleher. The defendant then requested to see a photograph of the victim. After being shown a crime scene photograph of the victim, [the defendant] began to cry. He asked the officer to pray with him, and he asked for God's forgiveness. The defendant then stated, 'I didn't mean to kill him,' and

---

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

that he wanted to tell his side of the story. At that point, the defendant told the Waterbury police officer questioning him that he had killed the victim by firing two gunshots through the apartment door of the victim after the victim stole $20 from him during a marijuana sale and had insulted his girlfriend.

"The defendant then agreed to have his statement . . . reduced to writing. He was readvised verbally of his constitutional rights, and he signed and dated a Waterbury police department voluntary statement [of] rights form, which included a written advisement of his rights in Spanish. State's exhibit number three. The court finds no evidence that the defendant was threatened or promised anything in exchange for agreeing to provide this statement.

"Detective Jannetty then asked [the defendant] to go through the events in detail, which the defendant then did in English as Detective Jannetty typed the words into a computer. Detective Jannetty . . . periodically stop[ped] and reread portions of the statement to the defendant and ask[ed] the defendant if it was correct.

"The statement, once completed, was then printed and read in its entirety to the defendant in English. The defendant was also read the statement in Spanish by Detective [Randolph] Velez, who had entered the room to assist with any translation needs. The defendant did not indicate any inaccuracy in the written statement and, after having his oath taken, signed and dated the statement and added his initials at the beginning and end of the statement to ensure that no further materials could be added. State's exhibit one.

"Although Detective Jannetty testified that the written statement is a verbatim . . . transcription of what the defendant stated, the court does not credit that

portion of his testimony. The defendant's written state-
ment also did not include any reference to the defen-
dant's earlier statement that he didn't intend to kill the
victim. The court, however, does conclude, based upon
Detective Jannetty's testimony, that the written state-
ment accurately characterizes the substance of the
defendant's statement regarding his involvement in the
death of the victim."

The court then found that the defendant had been in
custody at the time he gave his statement, which is not
contested by the state, and it issued the following ruling:
"The evidence establishes that [the defendant] was
transported to the police station in handcuffs and then
held at the Waterbury police department in an interior
room with no access to an exit from the building. The
state's supervising detective testified that he was not
free to leave once he arrived at the Waterbury police
department, and he was never informed that he was
free to leave. A reasonable person in view of the relevant
circumstances would have believed that he was not
free to leave. The court finds it unnecessary to decide
whether he was in custody prior to his arrival at the
police station because he did not make any inculpatory
statements prior to that.

"Once the defendant has met his burden of establish-
ing that he was subjected to custodial interrogation,
the prosecution bears the burden of proving beyond a
preponderance of the evidence that the *Miranda* warn-
ings were given. The court finds that the Waterbury
police department advised the defendant of his
*Miranda* rights before beginning the interrogation, a
second time before renewing the interrogation, and a
third and fourth time when taking his written statement.
The defendant was advised of his rights in English and
also had the opportunity to review written *Miranda*
warnings in Spanish. . . .

"The court also concludes that the defendant knowingly, voluntarily and intelligently waived his constitutional rights. The defendant indicated that he understood his rights. He indicated that he could speak English and could read and write in Spanish. He completed the ninth grade in the Bronx, New York, public school system. There is no evidence that he was intoxicated at the time or suffered from any mental disease, disorder or retardation. He read and signed two documents, state's exhibits number two and three, in the absence of any coercion, indicating that he understood his rights. And in one document, state's exhibit two, [he] affirmatively indicated that he was willing to waive his rights. . . . Based upon the totality of the evidence, the court concludes that he knowingly, intelligently and voluntarily agreed to waive his rights.

"Finally, the court recognizes . . . that the written statement the defendant seeks to suppress does not include the defendant's arguably exculpatory statement that he did not intend to kill the victim. Although this omission does not render the defendant's written statement inadmissible because the detective testified that he typed into the computer the entire version of the events recited by the defendant after he had agreed to reduce his statement to writing, the court frowns upon such a selective, potentially misleading exclusion of exculpatory information from the statement. Certainly, if and when the defendant's written statement is offered, the court will admit, if offered by the defendant, his oral statement that he did not intend to kill the victim.

"For all of these reasons, the motion to suppress is denied."

The defendant does not challenge the court's factual findings, which are supported by the record, but, rather,

he challenges the court's legal conclusion that his statement was voluntarily given where the court specifically had found that he could not read the statement and that there was a "potentially misleading exclusion of exculpatory information from the statement" by the police. He argues that the present case is similar factually to *Martinez* v. *Estelle*, 612 F.2d 173, 180 (5th Cir. 1980), in which, he argues, "the petitioner was an illiterate Mexican-American and could therefore not read the confession; and that the confession contained inaccuracies, unknown to the petitioner, specifically, the fact of scienter. This rendered the confession involuntary."

Our own review of *Martinez* reveals little similarity between it and the present case. In *Martinez*, the District Court, in the petitioner's habeas case, had concluded that the requirements for a determination of voluntariness had not been met at the petitioner's criminal trial but that the petitioner had failed to demonstrate facts that would show that his version of the events, if true, would require the conclusion that his confession was involuntary. See id. The United States Court of Appeals for the Fifth Circuit reversed the judgment of the District Court, concluding that the petitioner's recitation of the facts, if true, would demonstrate that his confession was involuntary. Id. Specifically, the court explained that the petitioner had "assert[ed] that he, an illiterate Mexican-American, was tricked into signing a statement that, unbeknownst to him, contained material inaccuracies. Although this type of trickery is not one of the traditional tools of coercion, [the court nevertheless] conclude[ed] that such trickery, if it occurred, is a due process violation . . . ." Id.

In the present case, there is nothing in the record to indicate that the defendant was tricked by the police into signing a confession because he could not read it. Rather, the record fully supports the court's finding that the police read the statement to the defendant both in

English and in Spanish before he agreed to sign the confession. In *State* v. *Madera*, 210 Conn. 22, 554 A.2d 263 (1989), the Supreme Court considered a claim that the confession of the defendant in that case should be suppressed for several reasons, including his inability to read the statement due to illiteracy. The court explained: "With reference to the claim of illiteracy, we note that, while it is a factor to be considered, there is no requirement that a person be literate before his confession may be received into evidence." Id., 44.

In *United States* v. *Gaines*, 295 F.3d 293 (2d Cir. 2002), the United States Court of Appeals for the Second Circuit considered a claim made by the defendant in that case that because he was illiterate and unable to read his statement, it should have been suppressed because it was "tainted . . . ." Id., 297. The court explained that "the inability of an accused to read or write is a factor to be considered in deciding the voluntariness of a confession. But that inability by itself does not mean a suspect cannot make a knowing, intelligent and voluntary waiver of his right to remain silent." Id., 296. The court went on to hold that despite being unable to read his confession, the defendant "knew full well what he was doing. He heard the statement, knew what it meant, and freely agreed to it." Id.

In the present case, we conclude that the court properly found that the defendant's inability to read his written statement, which had been read to him in its entirety in both English and Spanish, was not a bar to its admissibility at trial. Additionally, we do not agree with the defendant's construction of the court's decision denying his motion to suppress in which the court discussed the omission by the police of his assertion that he did not mean to kill the victim. The defendant argues that "the trial court found as a fact [that the written statement] did not accurately summarize [the defendant's] oral statement . . . ." Although the court

chastised the police for omitting this assertion from the written statement, it did not find that the assertion had been made during the time that Jannetty was taking down the defendant's confession, as the defendant suggests. Rather, the court credited Jannetty's testimony that "[Jannetty had] typed into the computer the entire version of the events recited by the defendant after he had agreed to reduce his statement to writing . . . ." The court merely was explaining that it thought the police should have included this earlier assertion in the written statement because it believed that this was a crucial assertion made by the defendant while in custody.

Although the defendant also argues that his confession was not voluntary because he was subjected to a "coercive atmosphere," the court specifically found that he was not coerced, and we can find no evidence in the record of any police tactics that would have overborne his will to resist. The police read the defendant his rights on more than one occasion, gave him food and drink and permitted him use of the bathroom. Jannetty consoled the defendant and even prayed with him when the defendant requested that he do so.

After closely reviewing the record, we conclude that the factual findings of the court were not clearly erroneous and that the defendant's confession was freely given and not the result of overbearing police conduct. See *State* v. *Lawrence*, supra, 282 Conn. 153. Accordingly, we conclude that the state met its burden of proving that the defendant's confession was voluntary.

## IV

Last, we address the defendant's claim that the court violated his constitutional rights when it gave contradictory and confusing instructions to the jury on the element of intent. The state concedes that the instruction was improper but argues, nonetheless, that it was not

reasonably possible that the jury was misled. Because the defendant did not preserve his claim of instructional impropriety by submitting a request to charge on murder[2] or by objecting to what he considered improper in the charge, he seeks on appeal to prevail under *State v. Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[3] We conclude that his claim is reviewable under *Golding* because the record is adequate for review, and the claim of instructional impropriety is of constitutional magnitude. See *State v. Denby,* 235 Conn. 477, 483, 668 A.2d 682 (1995). We further conclude, however, that the defendant cannot prevail on his claim because it is not reasonably possible that the jury was misled. Therefore, his claim fails under *Golding*'s third prong.

The standard of review for claims of instructional impropriety is well settled. "The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which [it] might find to be established . . . . When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety . . . and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party . . . . In this inquiry we focus on the substance

---

[2] The defendant did submit a request to charge related to lesser included offenses.

[3] "Under *State* v. *Golding,* supra, 213 Conn. 239–40, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; internal quotation marks omitted.) *State* v. *Lawrence,* supra, 282 Conn. 178 n.22.

of the charge rather than the form of what was said not only in light of the entire charge, but also within the context of the entire trial. . . . Moreover, as to unpreserved claims of constitutional error in jury instructions, we have stated that under the third prong of *Golding*, [a] defendant may prevail . . . only if . . . it is reasonably possible that the jury was misled . . . ." (Internal quotation marks omitted.) *State* v. *Lawrence*, supra, 282 Conn. 179.

The defendant argues that the court improperly read to the jury the entire definition of intent set forth in General Statutes § 53a-3 (11), which improperly instructed the jury that it could find him guilty if it found that he had the general intent to fire his gun when, in reality, the state was required to prove that he had the specific intent to kill the victim, not merely to fire the gun. He also argues that this impropriety was compounded when the court gave an instruction that was not warranted in this case, telling the jury that it could consider "[t]he type and number of wounds inflicted as well as the instrument used" in determining the defendant's intent.

As this court recently stated in *State* v. *Rivet*, 99 Conn. App. 230, 912 A.2d 1103, cert. denied, 281 Conn. 923, 918 A.2d 274 (2007): "The defendant's claim is not novel. This court has addressed the issue presented by that claim in numerous, previous cases. [T]he definition of intent as provided in § 53a-3 (11) embraces both the specific intent to cause a result and the general intent to engage in proscribed conduct. . . . [I]t is improper for a court to refer in its instruction to the entire definitional language of § 53a-3 (11), including the intent to engage in conduct, when the charge relates to a crime requiring only the intent to cause a specific result. . . . This court has further noted, however, that in cases in which the entire definition of intent was improperly read to the jury, the conviction of the crime requiring

specific intent almost always has been upheld because a proper intent instruction was also given. The erroneous instruction, therefore, was not harmful beyond a reasonable doubt [in those cases]." (Internal quotation marks omitted.) Id., 232–33.

Although the defendant cites *State* v. *DeBarros*, 58 Conn. App. 673, 680, 755 A.2d 303, cert. denied, 254 Conn. 931, 761 A.2d 756 (2000), in support of his contention that the instructions as a whole misled the jury to an incorrect verdict, we find that case distinguishable from the present case. In *DeBarros*, the court read the intent to "engage in conduct" language in its initial charge and in two of its supplemental charges. Id., 683. The court also referred back to the "engage in conduct" language seven times during its instructions to the jury. Id. Here, the court read the general intent instruction only once during its charge, while also specifically instructing the jury that it had to find that the defendant had the specific intent to kill the victim to find him guilty of murder.[4]

The defendant also urges, however, that the number of correct instructions versus incorrect instructions

---

[4] The court charged in relevant part: "Under [our] rule of law, if, and only if, you find the evidence is not sufficient to justify a conviction of the crime of intentional murder, you must then go on to consider whether the evidence is sufficient to establish beyond a reasonable doubt that the defendant is guilty of the lesser included crime of manslaughter in the first degree with a firearm or manslaughter in the second degree with a firearm or criminally negligent homicide as I shall define those crimes for you in a moment. Let me walk you through this carefully again. If you unanimously find the defendant guilty of the charge of intentional murder, no further deliberations are necessary and your verdict would be guilty of murder."

The court later charged: "In order to convict the defendant of murder, you must first find that the defendant caused the death of Patrick Kelleher. You must find proven beyond a reasonable doubt that Patrick Kelleher died as a result of the actions of the defendant. The state must also prove beyond a reasonable doubt that the defendant, in causing the death of the victim, did so with the specific intent to cause death. There is no particular length of time necessary for the defendant to have formed the specific intent to kill."

should not be relevant to our analysis in light of *State v. Sivak*, 84 Conn. App. 105, 112, 852 A.2d 812, cert. denied, 271 Conn. 916, 859 A.2d 573 (2004), a case in which a panel of this court stated that "appellate review should consist of more than a numerical count of how many times the instruction was correct rather than incorrect." Although we continue to agree with that principle, our reversal of the judgment on the basis of improper jury instructions in *Sivak* was due to the totality and seriousness of various instructional improprieties related to intent, not to one incorrect portion of the charge in which the court read § 53a-3 (11) in its entirety. See id. Such is not the case here. Although the defendant also argues that the court in this case did give an additional improper instruction when it told the jury that it could consider "[t]he type and number of wounds inflicted as well as the instrument used" in determining his intent, we conclude that such an instruction was not improper in this case.

The defendant explains that he could not have aimed at the victim's chest or aorta through a solid wooden door and that, therefore, "it [would be] unreasonable to conclude that the defendant knew the gunshot fired would hit a vital part of the victim." We fail to see how this argument supports the claim that this instruction was improper. Certainly, the court did not tell the jury that "the defendant knew the gunshot fired would hit a vital part of the victim." Rather, the court told the jury, inter alia, that in determining the defendant's intent, it could consider the type of wound, the number of wounds and the type of instrument used against the victim. The jury had evidence before it that the defendant had fired two gunshots from a .45 caliber pistol through a closed, solid wooden door, hitting the victim once in the chest. Contrary to the defendant's position, we think it just as likely that the jury, in considering "[t]he type and number of wounds inflicted as well as

the instrument used," would have considered exactly what the defendant wanted it to consider, which was that two gunshots were fired through a solid door, where the defendant was unable to see the victim, thereby challenging the state's assertion that the murder was intentional. It then was up to the jury to consider all of this evidence when returning its verdict and to decide whether the element of intent had been proven beyond a reasonable doubt.

We conclude that the court properly instructed the jury that to find the defendant guilty of murder, it had to find that he specifically intended to cause the death of the victim. Although we agree that the court improperly referred to the general intent to engage in proscribed conduct at one point in the charge, our review of the entire charge leads us to the conclusion that it is not reasonably possible that the improper portion of the instruction misled the jury. The court's instruction on specific intent eliminated any possibility that the jury would be confused with respect to the intent element of the charge of murder. It is not reasonably possible that the jury would have understood the instructions to not require that the state prove beyond a reasonable doubt that the defendant specifically intended to kill the victim. See *State* v. *DeJesus*, 260 Conn. 466, 476, 797 A.2d 1101 (2002). Accordingly, the defendant's claim fails to satisfy *Golding*'s third prong, as there is no clear constitutional violation that deprived the defendant of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.