******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

FLYNN, J., dissenting in part, concurring in part, and concurring in the result. In what passed for British justice of the time, one John Perry, after confessing to participation in the robbing and killing of William Harrison, was convicted of murder. His confession implicated his mother, Joan Perry, and averred that his brother, Richard Perry, had strangled Harrison. *Perry's Case* (1660), 14 Howell, St. Tr. 1312, 1312–17 (Eng.).[1] After a trial, John Perry, and his mother and brother were hanged separately. Id. The victim's body had not been found. Id., 1319. The only problem with all of this justice was that the supposed murder victim was not dead. Id. Sometime after the executions, the supposed murder victim returned alive to England claiming that he had been waylaid by three horsemen, eventually carried off to sea by Turks, and sold into slavery in Smyrna for almost two years, at which point he escaped and returned to England. Id., 1320. In part because of this case, the corpus delicti rule, requiring some evidence of actual death besides the confession of a person accused of a killing, eventually became a part of the common law. The purpose of the rule was to prevent convictions based on confessions, like Perry's, that were not reliable.

The rule as originally adopted in Connecticut required some evidence of death independent of the confession of an accused. See *State* v. *Doucette*, 147 Conn. 95, 98–100, 157 A.2d 95 (1959), overruled in part by *State* v. *Tillman*, 152 Conn. 15, 20, 202 A.2d 494 (1964). The most current reformulation of the rule stated in *State* v. *Hafford*, 252 Conn. 274, 314–18, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000), extended the rule adopted in *State* v. *Harris*, 215 Conn. 189, 192–97, 575 A.2d 223 (1990), that the corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti and that it is only necessary to require the government to establish the trustworthiness of the statements, to all types of crimes. *State* v. *Hafford*, supra, 316. However, in an important qualification, only a few lines later, in *Hafford*, Chief Justice McDonald, writing for a unanimous court, made a point to say: "We note, however, that proving the trustworthiness of a defendant's confession to a crime resulting in injury or loss often will require evidence of that injury or loss. For example, a confession to a homicide likely would not be trustworthy without evidence of the victim's death." Id., 317 n.23.

Logic does not explain why a man like Perry would confess to participating in a robbery and killing of a man who was not dead. See *Perry's Case*, supra, 14 Howell, St. Tr. 1312–17. However, what logic does not

explain, experience does. "The life of the law has not been logic; it has been experience." O.W. Holmes, Jr., The Common Law (1881) p. 1. As we once said of Justice Shea in *State* v. *Fauci*, 87 Conn. App. 150, 176 n.2, 865 A.2d 1191 (2005), aff'd, 282 Conn. 23, 917 A.2d 978 (2007), Chief Justice McDonald, too, had been blessed with vast experience at the bar[2] before taking the bench, which is something he drew on when he wrote that "a confession to a homicide likely would not be trustworthy without evidence of the victim's death."[3] *State* v. *Hafford*, supra, 252 Conn. 317 n.23.

In the case before us on appeal, the defendant, George Michael Leniart, was convicted of murder in violation of General Statutes § 53a-54a (a), and three counts of capital felony in violation of General Statutes (Rev. to 1995) § (5), (7) and (9), as amended by Public Acts 1995, No. 95-16, § 4. The body of the victim, A.P.,[4] has never been found.

I write separately because although I agree with the result the majority reaches in reversing the defendant's conviction and most of their reasoning,[5] I cannot agree with a precedent that expresses an opinion that independent evidence of death may not be necessary in some homicide cases. I agree with the portion of part I A of the majority opinion which holds that the defendant's confessions were sufficiently corroborated, but disagree that a sufficiency challenge was dependent on the applicability of *Golding*[6] review. Furthermore, although I agree with the majority that, in this case, there was sufficient independent evidence of the victim's death. I respectfully dissent from that portion of part I A which holds that the corpus delicti rule is merely evidentiary and independent proof of death is unnecessary in a murder case. First, this holding is unnecessary to the decision in a murder case like this where we all agree that there is independent evidence, circumstantial and otherwise, of the death of A.P.[7] Secondly, there are sound reasons to require independent circumstantial evidence to avoid convictions that are based solely on false confessions. That rationale is especially compelling in a case like this where there was at least a scintilla of evidence that a former neighbor and other persons reported seeing A.P. alive after her disappearance. Although the jury was free to reject this evidence,[8] its existence leads me to conclude that this is not the time nor is this the case to conclude that the corpus delicti rule has no place in our review of evidentiary sufficiency of the defendant's murder conviction.

The defendant claims that despite his lack of preservation by objecting to the testimony of others who testified to the admissions made by the defendant, his challenge to the sufficiency of the evidence is reviewable. I agree. The United States Supreme Court held in *Jackson* v. *Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), that "the Due Process Clause

of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (Internal quotation marks omitted.) In *Jackson* v. *Virginia*, supra, 319, the court provided a two step analysis for constitutional challenges to the sufficiency of the evidence supporting a criminal defendant's conviction. "First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution." *United States* v. *Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc), citing *Jackson* v. *Virginia*, supra, 319. "Second . . . the reviewing court must determine whether this evidence, so viewed is adequate to allow *any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *United States* v. *Nevils*, supra, 1164, quoting *Jackson* v. *Virginia*, supra, 319. In *State* v. *Adams*, 225 Conn. 270, 276 n.3, 623 A.2d 42 (1993), our Supreme Court noted: "We believe that *Jackson* v. *Virginia*, supra, [319] compels the conclusion that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. There being no practical significance, therefore, for engaging in a *Golding* analysis of an insufficiency of the evidence claim, we will review the defendant's challenge to his conviction . . . as we do any properly preserved claim." Therefore, a challenge to the sufficiency of the evidence to permit a jury to find proved each and every element of a crime charged, is always permissible under *Jackson* v. *Virginia*, supra, 307. See *State* v. *Adams*, supra, 275–76 n.3.[9] A necessary element of the crime of murder is that someone is dead. See General Statutes § 53a-54a (a).[10]

I do not agree with the portion of part I A of the majority's opinion that gives no weight to our Supreme Court's observation in *State* v. *Hafford*, supra, 252 Conn. 317 n.23, that while all crimes are governed by the trustworthiness formulation of the corpus delicti rule, "proving the trustworthiness of a defendant's confession to a crime resulting in injury or loss often will require evidence of that injury or loss." Id. I particularly agree with *Hafford's* specific note that "a confession to a homicide likely would not be trustworthy without evidence of the victim's death." Id. The wisdom of that note should not be abandoned when, as in this case, there is some thin evidence that the alleged victim was seen alive, by people who knew her, several years after the date of her disappearance.[11] I do not agree, therefore, that in a capital murder case, like this, that the corpus delicti rule is merely evidentiary and should not be invoked or applied on appeal in our review of evidentiary sufficiency of the state's evidence against the defendant, including confessions admitted with-

out objection.

To convict the defendant of murder, the state was required to prove both a death and that the defendant intentionally caused it.[12] *Jackson* v. *Virginia*, supra, 443 U.S. 307. The corpus delicti rule exists, going back to *Perry's Case*, so that persons are not convicted of murdering someone who is not dead based on confessions or admissions that are ultimately unreliable. See *Perry's Case*, supra, 14 Howell, St. Tr. 1312–17.

I conclude that despite the fact that the defendant did not object to the admission into evidence of his confessions to cellmates, on review of the sufficiency of all of the evidence including those confessions, it is important to review the record to assure that there was not only corroboration of the trustworthiness of the confessions to ensure that they were reliable and trustworthy, but to establish that trustworthiness, there be some independent evidence that the victim was dead.[13] I therefore agree with the United States Court of Appeals for the Seventh Circuit in *United States* v. *McDowell*, 687 F.3d 904, 912 (7th Cir. 2012), that the corpus delicti rule is best described as a hybrid rule and with our Supreme Court's footnote in *State* v. *Hafford*, supra, 252 Conn. 317 n.23, that a confession to homicide likely would not be trustworthy without evidence of the victim's death. Here, as the majority's opinion points out, there was circumstantial evidence, summarized in the majority's opinion, which, together with the inferences to be drawn from it, would permit the jury to conclude that the victim, A.P., was dead. Therefore, both *Jackson* and *Hafford* are satisfied.

Because I agree with the majority that there was ample independent evidence apart from the defendant's confession that the defendant caused A.P.'s death, I am of the opinion that although the corpus delicti rule was properly invoked, nonetheless the evidence stands the test of sufficiency in providing both circumstantial evidence of the death of A.P., and the reliability of the defendant's confessory admissions to intentionally causing it. I further agree with the majority that the intent to kill may also be inferred from the evidence that was before the jury. I, too, summarize the evidence and the resulting reasonable possible inferences to be drawn therefrom, from which the jury could have concluded *both* that A.P. was dead and that the defendant's confession was sufficiently corroborated. A.P. was a young girl of only fifteen years old at the time she went missing. She lived with her parents while attending high school. P.J. Allain, the state's witness, admitted at trial that she had been importuned by him to sneak out of her home on the night of her disappearance to go with him to a party, A.P. and Allain to be driven there by the defendant in his truck. Jackie Scott, a close friend of A.P.'s, testified that A.P. told her that she was going to a party with Allain on the night that she disappeared.

There was independent direct evidence from the testimony of the defendant's former wife that the defendant owned both a truck and a boat. From the evidence of A.P.'s agreement to sneak out to be with Allain, the jury was free to infer that her purpose in sneaking out of her house was not to run away but to be with Allain. She had no independent income, nor was there evidence that she had any skills or training that would permit her to support herself, from which facts the jury was free to infer that because of her reliance on parental support she did not freely choose permanently to leave home precipitously bereft of any alternative to that necessary support. She was last seen in her home on May 29, 1996. She never returned to it. Other than the clothes on her back, she took no personal items with her. The jury was free to infer from that failure to do so, that a person choosing to run away would have taken some such items with her and that she did not run away. Her mother, father, grandmother, and other close family members never heard from her again, from the May 29, 1996 date of her disappearance through the March 2, 2010 date of the verdict in the defendant's trial nearly fourteen years later. She had been particularly close to her mother and grandmother prior to her disappearance. The jury was free to infer from this lack of all communication with those closest to her, that she was no longer on this earth, because it was logical that she would have communicated with some or all of these family members sometime in the intervening fourteen years, were she still alive. Allain testified that he last saw A.P. in the defendant's truck, as he was being let off at his home. This evidence would permit a rational inference that she was last seen with the defendant.

There was a portion of the defendant's confessory statements that indicated that he had cut up A.P.'s body and put it into lobster traps where she would never be found. Additionally, there was corroborative direct testimony that the defendant was a commercial fisherman and owned a boat and lobster traps.[14] This circumstantial evidence convinces me that the state offered sufficient independent evidence permitting the jury to infer that A.P. was dead, even though her body had not been found, and corroborating the trustworthiness of the confessory admissions made by the defendant to others, with whom he was jailed, that he had killed her. General Statutes § 54-83 provides that in cases like this and the accused is charged with a capital felony where the crime is punishable by death or life imprisonment without the possibility of release, no person may be convicted without the testimony of two witnesses. However, the state can satisfy its statutory burden by producing more than one witness to provide circumstantial evidence from which the jury may infer the defendant's guilt.[15] *State* v. *Ross*, 230 Conn. 183, 219, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130

L. Ed. 2d 1095 (1995). Therefore, I would conclude that the material and substantial evidence of the corpus delicti was adequate for the jury to conclude the defendant's guilt as it did.

I agree with part II of the majority's opinion that the videotape of Allain's polygraph pretest interview is not per se excludable polygraph evidence under *State* v. *Porter*, 241 Conn. 57, 92–94, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), because the use of the videotape would not have revealed the results of the polygraph, nor was it offered as evidence of Allain's willingness to take the polygraph. Furthermore, I agree that there was error in not admitting the polygraph pretest because the videotape demonstrates that Allain was pressured to take the polygraph examination, to cooperate in order to avoid the fate of the uncooperative participants in the Maryann Measles case; see *State* v. *Dupas*, 291 Conn. 778, 786, 970 A.2d 102 (2009); and to present a story of which the police would approve. Therefore, I concur that the exclusion of the polygraph pretest interview was both in error and harmful to the defendant.

Accordingly, I concur in the result reached that the conviction must be reversed and a new trial granted.

[1] 14 T.B. Howell, A Complete Collection of State Trials (London, T.C. Hansard 1812). *Perry's Case* is entitled "A True and Perfect Account of the Examination, Confession, Trial, Condemnation, and Execution of Joan Perry, and her two Sons, John and Richard Perry, for the supposed Murder of William Harrison, Gent." *Perry's Case* (1660), 14 Howell, St. Tr. 1312, 1312 (Eng.).

[2] The following are illustrative, but not exhaustive, of that experience. See generally *State* v. *Avcollie*, 188 Conn. 626, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983); *State* v. *Avcollie*, 178 Conn. 450, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980); *State* v. *Avcollie*, 174 Conn. 100, 384 A.2d 315 (1977); *State* v. *Gold*, 180 Conn. 619, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State* v. *Gold*, 173 Conn. 778, 377 A.2d 1125 (1977).

[3] Two academic studies and a governmental commission in California have all concluded that the problems caused to the criminal justice system by false confessions did not end with John Perry's wrongful conviction. See G. Uelmen & C. Boscia eds., "California Commission on the Fair Administration of Justice Final Report," (June 30, 2008), pp. 35–41, available at http:// digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=1000&context= ncippubs (last visited May 31, 2016) (copy contained in the file of this case in the Appellate Court clerk's office) (Final Report); S. Drizin & R. Leo, "The Problem of False Confessions in the Post-DNA World," 82 N.C. L. Rev. 891 (2004); S. Gross & M. Shaffer, National Registry of Exonerations, "Exonerations in the United States, 1989–2012," (2012), available at http:// www.law.umich.edu/special/exoneration/Documents/ exonerations_us_1989_2012_full_report.pdf (last visited May 31, 2016) (copy contained in the file of this case in the Appellate Court clerk's office).

The study by Professor Samuel R. Gross of the University of Michigan School of Law and Michael Shaffer, entitled "Exonerations in the United States, 1989-2012, Report by the National Registry of Exonerations," concluded that "[f]alse confessions are a particularly disturbing type of evidence. Most people don't believe they would ever admit committing a crime of which they were innocent, and many are skeptical that anybody else would. And yet it happens—135 times among the exonerations we cover." S. Gross & M. Shaffer, supra, p. 57.

Dean Emeritus Gerald F. Uelmen, of the Santa Clara Law School, served from 2004 to 2008 "as executive director of the California Commission on the Fair Administration of Justice, created by the California State Legislature to investigate the causes of the conviction of innocent persons and make

recommendations to minimize the danger of wrongful conviction. In the final report that [Dean Uelmen] authored, six major causes of wrongful convictions were identified." G. Uelmen, If It Doesn't Fit Lessons From a Life in the Law (2016) pp. 74–76; see also Final Report, supra, 10–21. False confessions were identified as the second most frequent cause followed by "testimony by jailhouse snitches." G. Uelmen, supra, 76; see also Final Report, supra, 45.

[4] In accordance with the policy of protecting the interests of the victims of sexual abuse, the victim or others through whom the victim's identity may be ascertained will not be identified. See General Statutes § 54-86e.

[5] Specifically, I agree with that part of the majority opinion that holds that: "even if the defendant is permitted to raise the corpus delicti rule as part of his sufficiency of the evidence claim, the sufficiency claim fails because substantial evidence, circumstantial or otherwise, was admitted at trial to corroborate both the trustworthiness of his confessions and the fact of A.P.'s death. As a result, because the defendant's confessions may be considered by this court in assessing the sufficiency of the evidence, we apply the traditional standard of review in assessing the evidence and conclude that the evidence was sufficient for the jury to conclude beyond a reasonable doubt that A.P. is dead."

[6] *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), holding modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

[7] Specifically, I disagree with that portion of the majority opinion that holds that "under Connecticut law the corpus delicti rule is an evidentiary rule regarding the admissibility of confessions rather than a substantive rule of criminal law to be applied in reviewing the sufficiency of the state's evidence."

[8] Most of the evidence was hearsay not subject to cross-examination, some was admitted for the truth of it, and one affidavit admitted by stipulation.

[9] If we could posit a case where there were no objections to substantive evidence, and the defendant moved for acquittal on the basis of insufficient evidence of the crime charged, *Jackson* v. *Virginia*, supra, 443 U.S. 315, and *State* v. *Adams*, supra, 225 Conn. 270, teach us that such a defendant is entitled to its review because no person should be convicted of a crime if sufficient proof is lacking of a necessary element of that crime.

Our Supreme Court in *Adams* also noted: "The defendant concedes in his brief that he did not preserve the insufficiency of the evidence claim regarding the count of carrying a pistol without a permit at trial by moving for judgment of acquittal on that count. He therefore claims that he is entitled to prevail on this claim under *State* v. *Evans*, 165 Conn. 61, 69–70, 327 A.2d 576 (1973), and *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

"The United States Supreme Court held in *Jackson* v. *Virginia*, [supra, 443 U.S. 316] that the fourteenth amendment commands that 'no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.' If an appellate court is presented with an insufficiency of the evidence claim, reversal is constitutionally required if, 'after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' Id., 319." *State* v. *Adams*, supra, 225 Conn. 275–76 n.23.

[10] General Statutes § 53a-54a (a) provides in relevant part, "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[11] James Adrian Butler, a former Marine who had known A.P. and her family during the time that they were living in Virginia Beach when A.P. was younger, believed he saw A.P. several years after her disappearance and gave a statement which was admitted by stipulation at trial. Butler's statement read: "Around the first week of May [19]99, I was working in [a] Blockbuster video store, [in] Haygood Road, Virginia Beach, Virginia. I saw [A.P.] checking out a video because I was working behind the counter. She was with a man whom I assumed was her boyfriend because they were hugging. The man was a white male with dark hair and the top of her head came right above his chin level. In my opinion, he was maybe a couple of years older than her. At first she didn't recognize me but I thought it was her.

"I started talking to her and asked if she lived in Virginia Beach when I was there and she said yes. Then she remembered who I was and we talked for a little while. At that time, she said she was going to Tidewater Community College (TCC), Virginia Beach. When they got ready to check out the movie, the guy she was with handed me the card. When I scanned the card, [A.P.'s]

name was not on the card but her name came up as an authorized user. After checking out the movie, they left and I haven't seen or heard from her any more.

"I returned from Marine Corps boot camp during the middle of July. I talked with a couple of my friends, who attend TCC, and I was basically getting caught up on what was going on. [A.P.'s] name came up. They were talking about who she was dating and that she was going to school at TCC.

"There are a couple guys who attend TCC that I know of that know [A.P.] They are Abraham Dunning and a guy whom I only know by his last name which is Blasse. To my knowledge, they are both currently enrolled in TCC. Blasse's dad is in the Navy and he is a hard hat diver and he lives with his dad. The last time I heard, his dad was stationed at the Naval Amphibious Station in Norfolk, Virginia.

"I'm fairly certain that [A.P.] is still in Virginia Beach unless she left within the last two months."

During the cross-examination of Martin Graham, a detective with the Department of Public Safety Connecticut State Police, by defense counsel, the following exchange occurred regarding Detective Graham's communication with Butler:

"[Defense Counsel]: You told the Norwich Bulletin in December of 2000 that you had spoken to James Adrian Butler, correct?

"[Detective Graham]: That's correct.

"[Defense Counsel]: And that you found him to be credible, correct?

"[Detective Graham]: Yes.

"[Defense Counsel]: And what you found him to be credible on was his statement that he had seen [A.P.] in Virginia Beach in May of 1999, correct?

"[Detective Graham]: That's correct."

The police witnesses testified that others claimed to have seen A.P., but police investigation could not confirm that A.P. was in fact the person sighted after her disappearance. The jury was free to reject the stipulation testimony along with all of the testimony regarding the alleged sightings of A.P., however, because there was a scintilla of evidence that the murder victim was not in fact dead, this is not the case to disregard what Chief Justice McDonald said in *State* v. *Hafford*, supra, 252 Conn. 317 n.23.

[12] "To establish a violation of § 53a-54a, the crime of murder, the state must prove beyond a reasonable doubt that the defendant, with intent to cause the death of another person . . . cause[d] the death of such person. . . . [T]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim." (Citation omitted; internal quotation marks omitted.) *State* v. *Aviles*, 107 Conn. App. 209, 217, 944 A.2d 994, cert. denied, 287 Conn. 922, 951 A.2d 570 (2008).

[13] There has been a debate from time to time as to whether inculpatory statements made by a defendant to others should be viewed as admissions or confessions. See 1 Broun, K., McCormick on Evidence (7th Ed. 2013) § 144, pp. 799–800 ("[t]raditional analysis sometimes required inquiry into whether a self-incriminating statement by a defendant was a 'confession'— a statement admitting all facts necessary for a conviction of the crime at issue—or an 'admission'—an acknowledgement of one or more facts tending to prove guilt but not of all the facts necessary to do so"). The defendant never made a written confession to police authorities; he did make admissions to his culpability to persons with whom he was incarcerated.

[14] On direct examination, Paul Killoran, formerly of the Connecticut State Police, testified that "[the defendant] proceeded to tell us that he . . . owned a boat out of Point Judith, Rhode Island, and that he was a fisherman . . . ." Former Trooper Killoran also testified that the defendant explained his relationship with Allain by saying that "[the defendant] said that he had known P.J. Allain from the time that P.J. was seven years of age and that in 1995, he had actually hired P.J. to help maintain and repair lobster traps that were on the property."

[15] Zee Ching, unlike other jailhouse informants who were still incarcerated and expecting favors for their testimony, was a particularly reliable witness. Ching, who had been jailed for drunken driving, came forward of his own volition at the urging of his wife after all of his sentence was served, and when he had no probation or parole hanging over him for which he might seek favorable treatment from the prosecution. Ching testified that the defendant admitted to him that he had raped and killed a girl on his boat, and that he had hidden the body in a well before dumping it in the Long Island Sound. Therefore, in my opinion, existence of that circumstantial evidence exists here.