******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# FRANTZ CATOR *v.* COMMISSIONER
## OF CORRECTION
### (AC 39795)

Alvord, Prescott and Pellegrino, Js.

*Syllabus*

The petitioner, who previously had been convicted of, inter alia, felony
murder in connection with a shooting incident and had filed three peti-
tions for a writ of habeas corpus, filed a fourth petition for a writ of
habeas corpus, claiming, inter alia, that his appellate counsel had ren-
dered ineffective assistance on direct appeal from his conviction. The
petitioner had picked up the shooter in his vehicle and driven to the
victim's residence, where the victim was forced into the vehicle and
later fatally shot with a gun that belonged to the petitioner. In his fourth
habeas petition, the petitioner claimed, inter alia, that his appellate
counsel improperly failed to raise a claim that the trial court improperly
instructed the jury on intent, and that the evidence was insufficient to
sustain the petitioner's convictions of murder, conspiracy to commit
murder and felony murder. The habeas court rendered judgment denying
the habeas petition and, thereafter, denied the petition for certification
to appeal, and the petitioner appealed to this court. *Held*:
1. The habeas court did not abuse its discretion in denying the petition for
   certification to appeal, as the petitioner's claims did not involve issues
   that were debatable among jurists of reason, that could have been
   resolved by a court in a different manner or that deserved encouragement
   to proceed further.
2. The habeas court properly determined that the petitioner failed to demon-
   strate that his appellate counsel provided ineffective assistance:
   a. The petitioner could not prevail on his unpreserved claim that his
   appellate counsel should have raised a claim that the trial court improp-
   erly read to the jury the entire statutory (§ 53a-3 [11]) definition of
   intent when the crimes with which the petitioner was charged required
   instructions only as to specific intent; the record supported the habeas
   court's conclusion that appellate counsel made a reasonable strategic
   decision to forgo a weak claim of instructional error, as the record
   indicated that the trial court read the improper instruction only as a
   general definition of intent, and that it repeatedly gave a proper instruc-
   tion as to each offense and provided the jury with a handout that listed
   the essential elements of each charged offense, and, under the facts of
   the present case, because an appellate court may have rejected a claim
   that there was a reasonable possibility that the trial court's instructions
   misled the jury, the petitioner's claim would have failed to satisfy the
   requirement of *State* v. *Golding* (213 Conn. 233) that a constitutional
   violation existed and deprived him of a fair trial.
   b. The petitioner's appellate counsel was not ineffective and acted rea-
   sonably by not raising a claim that the evidence was insufficient to
   prove that the petitioner was guilty of murder as an accessory and
   conspiracy to commit murder, there having been sufficient evidence
   adduced at trial to prove that the petitioner was guilty of those crimes;
   the jury reasonably could have found, inter alia, that the petitioner had
   been angered by the disappearance of a certain gun, that the petitioner
   drove away from the victim's residence after the victim had been forced
   into the petitioner's vehicle, that the victim was shot after he and the
   alleged shooter had gotten out of the vehicle, that the petitioner drove
   back to the victim's residence after the shooting, and that the victim
   was fatally shot with a gun that belonged to the petitioner.
   c. The petitioner could not prevail on his claim that his appellate counsel
   was ineffective in failing to raise a claim that the evidence was insuffi-
   cient with respect to the charge of felony murder; the habeas court
   properly concluded that the jury logically and reasonably could have
   inferred that, during the victim's abduction by the petitioner, the peti-
   tioner supplied the shooter with the firearm that was used to kill the
   victim.
3. The petitioner's claim that his due process rights were violated when the

trial court erroneously instructed the jury as to intent was unavailing; the habeas court properly determined that the petitioner's due process claim was subject to procedural default and that the petitioner failed to demonstrate good cause and actual prejudice to excuse the procedural default of his claim, which was not raised on direct appeal pursuant to a reasonable strategy.

Argued November 14, 2017—officially released April 17, 2018

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Sferrazza, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed.*

*Naomi T. Fetterman*, assigned counsel, for the appellant (petitioner).

*Linda F. Currie-Zeffiro*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Emily D. Trudeau*, deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

PELLEGRINO, J. The petitioner, Frantz Cator, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his fourth petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court (1) abused its discretion in denying his petition for certification to appeal from the denial of his amended petition, (2) improperly concluded that he failed to establish that his appellate counsel in his direct criminal appeal rendered deficient performance, and (3) improperly concluded that his stand-alone due process claim was procedurally defaulted. We conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal and, accordingly, dismiss the petitioner's appeal.

The following facts and procedural history are relevant to our disposition of the petitioner's appeal. In connection with the murder of the victim, Nathaniel Morris, the state charged the petitioner with capital felony in violation of General Statutes § 53a-54b (5); felony murder in violation of General Statutes § 53a-54c; murder as an accessory in violation of General Statutes §§ 53a-54a (a) and 53a-8 (a); conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a (a); kidnapping in the second degree in violation of General Statutes § 53a-94 (a); conspiracy to commit kidnapping in the second degree in violation of §§ 53a-48 and 53a-94 (a); and commission of a Class A, B or C felony with a firearm in violation of General Statutes § 53-202k.

A five day jury trial began on October 14, 1997. At the close of the state's evidence, the petitioner's trial counsel, Kevin Randolph, moved for a judgment of acquittal with respect to the charges of capital felony murder, felony murder, murder, conspiracy to commit murder and conspiracy to commit kidnapping in the second degree on the basis of insufficient evidence. The court granted the petitioner's motion only as to the capital felony murder charge. The petitioner was subsequently convicted on all remaining charges and sentenced to a total effective term of fifty-five years incarceration, execution suspended after fifty years, followed by five years of probation. See *State* v. *Cator*, 256 Conn. 785, 787–88, 781 A.2d 285 (2001).

The petitioner appealed from the trial court's judgment to this court, and our Supreme Court transferred the appeal to itself pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Id., 788. Attorney Suzanne Zitser, the petitioner's appellate counsel, raised seven issues on his behalf, specifically claiming that the trial court improperly "(1) failed to determine whether there was a conflict in dual representation at the probable cause hearing; (2) admitted evidence of the

[petitioner's] prior, uncharged drug dealing; (3) failed to instruct the jury regarding the [petitioner's] prior drug dealing; (4) modified the judgment of conviction after the [petitioner] had begun serving his imposed prison term; (5) charged the jury that § 53-202k is a separate offense and encompasses accessory liability; (6) sentenced him to concurrent terms for two conspiracies and thereby violated the ban on double jeopardy; and (7) failed to provide him with formal notice that he had violated his probation stemming from a previous conviction." *State* v. *Cator*, supra, 256 Conn. 789. Our Supreme Court subsequently reversed the trial court's judgment in part and remanded the case with direction (1) to vacate the petitioner's conviction under § 53-202k and to conduct a new trial on the issue of whether the petitioner "used a proscribed firearm in the commission of the underlying offense"; id., 812; and (2) to merge the petitioner's convictions of the conspiracy offenses and to impose one sentence for that conviction. See id., 813. The judgment was affirmed in all other aspects. See id. On April 22, 2003, the trial court modified the petitioner's sentence to a total effective sentence of forty-five years.

The petitioner has brought five habeas petitions since he was convicted.[1] On December 4, 2013, the self-represented petitioner filed his fourth petition for a writ of habeas corpus. On June 7, 2016, the petitioner, represented by appointed counsel, filed the amended three count operative petition. The petitioner alleged: (1) the ineffective assistance of his trial counsel; (2) the ineffective assistance of his appellate counsel in his direct criminal appeal, on the basis of her failure to raise claims of instructional error and insufficient evidence to sustain his convictions of murder, conspiracy to commit murder, and felony murder; and (3) a violation of his due process rights at his underlying criminal trial on the basis of the aforementioned instructional impropriety. On July 12, 2016, the respondent, the Commissioner of Correction, moved to dismiss the petitioner's amended petition in its entirety. On July 21, 2016, the petitioner filed an objection to the respondent's motion to dismiss.

The habeas trial was held on July 25, 2016. The habeas court granted the respondent's motion to dismiss with respect to the petitioner's claim against his trial counsel. The habeas court heard testimony from Randolph, Zitser, and Assistant State's Attorney C. Robert Satti, Jr., the prosecutor in the petitioner's criminal trial. The petitioner also presented expert testimony from Attorney Norman A. Pattis, an expert in criminal defense matters in state court, and Attorney Michael Taylor, an expert in appellate law, both of whom rendered opinions as to the effectiveness of Zitser. On October 11, 2016, the habeas court issued a written decision denying the petitioner's amended petition. The habeas court concluded that the petitioner failed to establish that

Zitser had rendered deficient performance and that the petitioner's due process claim was procedurally defaulted. Thereafter, on October 19, 2016, the habeas court denied the petition for certification to appeal, and this appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The petitioner claims that the habeas court abused its discretion in denying his petition for certification to appeal from the denial of his amended petition for a writ of habeas corpus. We disagree.

Preliminarily, we set forth the standard of review that governs our disposition of the petitioner's appeal. "Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, [the petitioner] must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits. . . . To prove that the denial of his petition for certification to appeal constituted an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification." (Internal quotation marks omitted.) *Salmon* v. *Commissioner of Correction*, 178 Conn. App. 695, 700–701, 177 A.3d 566 (2017).

As discussed subsequently in parts II and III of this opinion, we conclude that the petitioner's underlying claims do not involve issues that are debatable among jurists of reason, could not have been resolved by a court in a different manner or that the questions raised deserve encouragement to proceed further. Accordingly, the habeas court did not abuse its discretion in

denying the petition for certification to appeal from the denial of the amended petition for a writ of habeas corpus.

## II

We now turn to the petitioner's substantive claims that the habeas court improperly concluded that the petitioner failed to establish ineffective assistance of his appellate counsel. The petitioner claims that his appellate counsel rendered ineffective assistance by failing to raise the following claims on direct appeal: (1) instructional error with respect to intent, and (2) insufficient evidence adduced at trial to sustain his convictions of murder as an accessory, conspiracy to commit murder, and felony murder. We disagree.

We begin by setting forth the applicable standard of review and legal principles governing claims of ineffective assistance of appellate counsel. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, the habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) Id., 703.

"[I]t is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, [466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution." (Internal quotation marks omitted.) *Salmon* v. *Commissioner of Correction*, supra, 178 Conn. App. 702. "Our Supreme Court has adopted [the] two part analysis [set forth in *Strickland* v. *Washington*, supra, 687] in reviewing claims of ineffective assistance of appellate counsel. . . . To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Because the petitioner must satisfy both prongs of the *Strickland* test to prevail on a habeas corpus petition, this court may dispose of the petitioner's claim if he fails to meet either prong. . . .

"Under the performance prong, [a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . . [Although] an appellate advocate must provide effective assistance, [she] is not under an

obligation to raise every conceivable issue. A brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions. . . . [I]f the issues not raised by his appellate counsel lack merit, [the petitioner] cannot sustain even the first part of this dual burden since *the failure to pursue unmeritorious claims cannot be considered conduct falling below the level of reasonably competent representation.*" (Emphasis in original; internal quotation marks omitted.) *Toccaline* v. *Commissioner of Correction*, 177 Conn. App. 480, 496, 172 A.3d 821, cert. denied, 327 Conn. 986, 175 A.3d 45 (2017).

A

With that legal framework in mind, we first address the petitioner's claim that the habeas court improperly concluded that his appellate counsel did not render deficient performance by failing to raise an instructional claim on direct appeal. More specifically, the petitioner challenges the habeas court's conclusion that appellate counsel made a "strategic decision" not to pursue this claim on appeal given the "preexisting judicial recognition of the instructional impropriety." We disagree with the petitioner.

In order to determine whether appellate counsel made a reasonable strategic decision not to raise the claim of instructional error in the petitioner's direct criminal appeal, we must evaluate the merits of the claim itself. Although the petitioner's instructional error claim was not preserved before the criminal trial court, had the claim been raised on direct appeal, review may have been available at that time pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015),[2] or alternatively, the plain error doctrine.[3]

"[The *Golding* doctrine] permits a [petitioner] to prevail on [an unpreserved] claim of constitutional error . . . only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [petitioner] of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . [T]he first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the [petitioner] may prevail." (Citations omitted; internal quotation marks omitted.) *State* v. *Montanez*, 277 Conn. 735, 743–44, 894 A.2d 928 (2006). The record in the present case is adequate for our review because it contains the full transcript of the underlying criminal proceedings. Moreover, "when

intent is an element of a crime, a trial court's failure to instruct the jury properly with respect to intent implicates the due process rights of the [petitioner]." Id., 744. We therefore turn to *Golding*'s third prong, which is dispositive of the petitioner's instructional claim. See, e.g., *State* v. *Aviles*, 107 Conn. App. 209, 230, 944 A.2d 994 ("as to unpreserved claims of constitutional error in jury instructions, we have stated that under the third prong of *Golding*, [a] defendant may prevail . . . only if . . . it is reasonably possible that the jury was misled" [internal quotation marks omitted]), cert. denied, 287 Conn. 922, 951 A.2d 570 (2008).

The issue in the present matter is whether the petitioner's appellate counsel should have raised a claim that the trial court improperly instructed the jury on intent when it read the entire definitional language of General Statutes § 53a-3 (11). Section 53a-3 (11) provides that "[a] person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ."

The petitioner argues that it was improper for the trial court to instruct the jury regarding general intent, the intent to engage in conduct, and specific intent, the intent to cause such result, because the crimes he was charged with required instructions only as to specific intent.[4] The petitioner further argues that "[a]s a result of this instructional impropriety, the jury was misled as to the state's burden of proof on the essential element of intent," and the error allowed the jury to find him guilty of specific intent crimes while employing the lower standard of general intent. In response, the respondent argues that, viewing the charge in its entirety, there is no reasonable possibility that the jury was misled because the "trial court repeatedly instructed the jury regarding the specific intent necessary to commit murder, second degree kidnapping, and conspiracy to commit those crimes." We agree with the respondent.

We next set forth the legal principles applicable to our analysis of the petitioner's instructional claim. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In

other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *Salters* v. *Commissioner of Correction*, 175 Conn. App. 807, 818–19, 170 A.3d 25, cert. denied, 327 Conn. 969, 173 A.3d 954 (2017); see also *State* v. *Revels*, 313 Conn. 762, 784, 99 A.3d 1130 (2014), cert. denied,      U.S.     , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015).

"Although [our appellate courts] have stated that [i]t is improper for the trial court to read an entire statute to a jury when the pleadings or the evidence support a violation of only a portion of the statute . . . that is not dispositive. We must determine whether it is reasonably possible that the jury was misled by the trial court's instructions." (Internal quotation marks omitted.) *Salters* v. *Commissioner of Correction*, supra, 175 Conn. App. 819. "[I]n cases in which the entire definition of intent was improperly read to the jury, the conviction of the crime requiring specific intent almost always has been upheld because a proper intent instruction was also given. [In those cases] [t]he erroneous instruction, therefore, was not harmful beyond a reasonable doubt."[5] (Internal quotation marks omitted.) *State* v. *Rivet*, 99 Conn. App. 230, 232–33, 912 A.2d 1103, cert. denied, 281 Conn. 923, 918 A.2d 274 (2007). Beginning with *State* v. *DeBarros*, 58 Conn. App. 673, 755 A.2d 303, cert. denied, 254 Conn. 931, 761 A.2d 756 (2000), however, this court has recognized a limited number of cases in which it was reasonably possible that the jury was misled when the trial court included the complete statutory definition of intent to the jury for crimes requiring specific intent.[6]

With those legal principles in mind, we turn to the trial court's jury instructions as set forth in the transcripts of the petitioner's underlying criminal proceeding. On Friday October 17, 1997, during its preliminary instructions, the court explained the following to the jury: "[The] offenses [to be defined] [on] Monday [are] all specific intent crimes. That means that the person charged has to have a specific intent to commit a particular crime." The trial court defined intent as follows: "[I]ntent is the status in a person's mind. It is the act of an intellect. . . . [I]ntent is required for the commission of the crime. Intent is defined in the statutes. It binds you and me. And [General Statutes § 53a-3 (11)] states that a person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause a result or to engage in such conduct. Murder is the unlawful taking of the life of another with an intent to take that life. The person charged with that offense must act intentionally, the intent to take a life at the time the life is taken, and it must be by the act of the person charged. Intentional conduct is purposeful conduct, rather than conduct that is accidental or inad-

vertent or unintentional conduct." The court further stated: "[A] person's intention may be inferred from their conduct or his conduct. You may infer from the fact that an accused engaged in conduct that he intended to engage in that conduct. . . . You may not presume the existence of intent. You may not presume that a person intended the consequences of their act, but you may draw reasonable and logical inferences that a person's intention is exhibited by the total circumstances demonstrating the . . . conduct of the people involved in this case."

The following Monday, the court repeated its preliminary instructions and, for a second time, read the full statutory definition of intent under § 53a-3 (11).[7] Throughout the remainder of its instructions, the court referred the jury to this definition of intent on seven occasions, but did not repeat the definition itself. The court explained the principle of accessorial liability under § 53a-8, noting that "[i]n order to be an accessory to a crime, the [petitioner] must have the same criminal intent required for the crime to which he is an accessory, as I've explained intent to you and will explain it again."[8]

Thereafter, when instructing the jury on the specific elements of kidnapping in the second degree, the court read the statutory definition set forth in § 53a-94.[9] The court further instructed that, in order to find the petitioner guilty of that offense, the jury must find that he intended to abduct and restrain the victim. The court's instruction provided in relevant part: "A person is guilty of kidnapping in the second degree when he abducts another person. The first term is abduct. Abduct means to restrain a person with intent to prevent his liberation either by secreting or hiding him in a place where he is not likely to be found or by using or threatening to use physical force or intimidation. . . .

"The next term to be defined is to restrain. Restrain means to restrict a person's moving intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another or by confining him either in the place where the restriction first begins or in a place to which he has been moved to without consent. Without consent includes, but is not limited to, deception.

"As you can see, abduction and restraining must be intentional. There must be an intent to interfere intentionally with the victim's liberty and an intent to prevent the victim's liberation by, one, secreting or hiding him in a place where he is not likely to be found; two, by using or threatening to use physical force or intimidation. Remember my earlier instruction in regard to intentional conduct." The court repeated this proper instruction at least two more times during its charge.

With respect to murder,[10] the trial court instructed that in order to find the petitioner guilty of that offense,

the jury must find that he specifically intended to cause the death of the victim. The court's instruction provided in relevant part: "Now . . . take into account the same instructions I have given you Friday and today on intentional conduct and accessorial liability as it applies. . . . A person is guilty of murder when, with the intent to cause the death of another person, he causes the death of such person." The court subsequently discussed each element of the offense, stating in relevant part: "There are two elements, each of which the state must prove beyond a reasonable doubt in order to sustain a conviction. . . . First is that the [petitioner] had the intent to cause the death of another person. Please bring into play my instructions in regard to the definition of intentional conduct. The second element is that the [petitioner] or [a coconspirator] acting with that intent to cause the death of [the victim], did shoot with a firearm and cause the death of [the victim]." The court repeated this proper instruction at least six more times during its charge.

The court then instructed the jury on the elements of conspiracy to commit kidnapping in the second degree and conspiracy to commit murder, stating that "[a] person is guilty of conspiracy when, with the intent to [engage in] conduct constituting a crime . . . he agrees with one or more persons to engage in or cause the performance of such conduct and any one of them commits an overt act in pursuance of such conspiracy." The court repeated this proper instruction at least six more times during its charge.

In addition to its oral charge, the court provided the jury with a "schematic," which "list[ed] . . . the essential elements" and "what [was] required to be proven beyond a reasonable doubt" for each charged offense. The jury began its deliberations and, thereafter, sent the following note to the court: "Your Honor, if possible we would like the *written* definitions of the following terms: [1] reasonable doubt; [2] intent; and [3] conspiracy." (Emphasis in original.) In response to that note, the court provided the jury with written instructions regarding conspiracy, intent[11] and reasonable doubt.

We now turn to the testimony elicited at the petitioner's habeas trial. The petitioner's appellate counsel explained that as an appellate attorney, she reviewed jury instructions in their entirety, and not in isolated portions. She also testified that she was aware that the court improperly instructed the jury by including the full statutory definition of intent, but believed that the court had provided accurate instructions of the crimes charged, specifically testifying: "When you look at . . . the charge as a whole and specifically when the judge charged on the specific crimes . . . he gave the intent to cause the result. . . . He . . . referred only to that portion of the intent instruction." Appellate counsel further testified that, although she was aware of the

*DeBarros* case, which was issued in 2000, three years after the petitioner's criminal trial, she did not raise an instructional claim because she "felt that it would be harmless error." Similarly, the petitioner's trial counsel testified that he did not take exception to the court's instructions on intent because he did not think "they were . . . an incorrect statement of the law," and that "focus[ing] on the tenor and timbre of the entire instruction . . . [it] left no doubt as to the intent necessary . . . ."

The petitioner's experts, Pattis and Taylor, both provided opinions with respect to this issue. Pattis would not concede that "the court gave what would have been apparent to a lawyer of ordinary skill and training at that time an incorrect instruction," but explained that, given *DeBarros*, he "would have liked it as a potential appellate issue . . . ." Although Pattis opined that there was a "substantial likelihood" that the jury was misled regarding the state's burden of proof, he classified the petitioner's case as "somewhere between *DeBarros* . . . and the cases where the court held it was not pervasive."

Taylor testified that in a murder case his practice was to raise any good faith issue because the stakes are so high. Taylor testified that "the trial court very clearly at one point gave the wrong instruction on intent, including a broader intent aspect than is permissible with respect to these specific intent crimes, but the court repeatedly gave a specific intent charge as well, and when you take the charge as a whole, [he thought] it would be very unlikely that you would convince an appellate court that the jury was misled by the charge."[12] Taylor nevertheless opined that appellate counsel's failure to raise this claim constituted ineffective assistance.

The habeas court, in its memorandum of decision, stated that: "[Appellate counsel] had considered and declined to press this issue in the petitioner's appeal. She recognized that the trial judge lacked the benefit of [this court's] wisdom because [*State* v. *DeBarros*, supra, 58 Conn. App. 673] arose three years posttrial. [Appellate counsel] was also aware that our appellate tribunals have seldom reversed convictions based on this particular error since that case was decided. . . .

"In the petitioner's case, the trial judge correctly informed the jurors of the specific intent that the prosecution need[ed] to prove, beyond a reasonable doubt, when he instructed on each crime individually. [Appellate counsel] reasonably opined that this claim was unlikely to succeed, and she devoted her limited brief pages and argument to more meritorious issues. The court finds that this professional decision came within the wide boundaries of acceptable legal representation. Therefore, the petitioner has failed to satisfy his burden of proving, by a preponderance of the evidence, that

his appellate lawyer rendered ineffective assistance as to this specification of deficient performance." (Citation omitted.)

With the foregoing facts in mind, we now address the habeas court's conclusion that appellate counsel did not render deficient performance by failing to raise this instructional claim on appeal. The petitioner contends that his case "presents a greater danger of a misled jury than . . . *DeBarros*." In *DeBarros*, the trial court, during its initial instructions, charged the jury on the elements of murder as follows: "There are two elements that the state has to prove . . . beyond a reasonable doubt. . . . The first element is that the defendant had the intent to cause the death of another person. Our statutes and law [are] that a person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct." (Internal quotation marks omitted.) *State* v. *DeBarros*, supra, 58 Conn. App. 683–84. Additionally, the court, while instructing the jury on other crimes, referred to this definition of intent on seven occasions. See id., 678, 683. Thereafter, during its deliberations, the jury requested clarification regarding intent and attempt to commit murder. Id., 678–79. In response, the court twice repeated the definition of intent. Id., 679. On appeal, this court reversed the defendant's murder conviction, holding that it was reasonably possible that the jury was misled because: (1) "the trial court's improper instructions were too numerous to be rectified by [its] proper instructions," and (2) "the court read the instruction as a specific definition of the intent required for [murder] . . . [which] likely misled the jury to believe that to intend to cause the death of another person means either to intend to cause the death of that person or to intend to engage in conduct that causes the death of that person." Id., 683–84. The court in *DeBarros* also noted that the trial court "did not provide instructional handouts to the jury that would have properly explained the element of intent." Id., 684 n.15.

We are not persuaded that the petitioner's case presents a situation analogous to that of *DeBarros* or those cases in which it was reasonably possible that the jury was misled by the trial court's instructions. Although similar to *DeBarros* in that the court in this case read, provided, or referred to the improper instruction a total of ten times, "[a] quantitative 'litmus test' measuring how frequently a trial court gives an irrelevant instruction is . . . insufficient to establish an instruction's tendency to mislead the jury." *State* v. *Montanez*, supra, 277 Conn. 746; see also *State* v. *Santiago*, 87 Conn. App. 754, 764, 867 A.2d 138, cert. denied, 273 Conn. 938, 875 A.2d 45 (2005). In the present case, unlike *DeBarros*, the record indicates that the trial court read the improper instruction only as a general definition of intent. The

record further indicates that the court repeatedly gave a proper instruction as to each specific offense. Moreover, the court provided the jury with a handout that listed the essential elements of each charged offense, reminding them that the petitioner must have the specific intent to cause the result referred to in the statute.

After a careful review of the entire jury charge, we cannot conclude that appellate counsel's strategic decision not to raise the instructional error claim was unreasonable. Under the facts of this case, an appellate court may have rejected a claim that there was a reasonable possibility that the jury was misled by the trial court's instructions. Accordingly, the petitioner's claim would have failed to satisfy *Golding*'s third prong because he is unable to demonstrate that a constitutional violation exists and deprived him of a fair trial.[13] See *State* v. *Aviles*, supra, 107 Conn. App. 229–30. The law and record, therefore, support the habeas court's conclusion that appellate counsel made a reasonable strategic decision in choosing to forgo a weak claim of instructional error, especially in view of other stronger claims, including two on which the petitioner prevailed. We conclude that the habeas court properly determined that the petitioner failed to demonstrate that appellate counsel rendered deficient performance with respect to this claim.

B

We now address the petitioner's claim that appellate counsel provided ineffective assistance by failing to raise claims on direct appeal that the evidence was insufficient to prove his convictions of (1) murder as an accessory and conspiracy to commit murder, and (2) felony murder.

The two part test this court applies in reviewing the sufficiency of the evidence supporting a criminal conviction is well established. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 767, 36 A.3d 670 (2012).

"In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the [petitioner's] innocence." *State* v. *Delgado*, 247 Conn. 616, 620, 725 A.2d 306 (1999). "[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by

the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Grant*, 219 Conn. 596, 604, 594 A.2d 459 (1991). As our Supreme Court has often noted, "proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the [petitioner] that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Aloi*, 280 Conn. 824, 842, 911 A.2d 1086 (2007).

With that legal framework in mind, we turn to the facts that our Supreme Court, in its prior decision on the petitioner's direct appeal, determined that the jury reasonably could have found. "Desmond Hamilton, the [petitioner] and the victim . . . all knew each other and had participated in the sale of drugs together. On May 10, 1996, on Laurel Court, a dead-end street in Bridgeport, the [petitioner] and Hamilton had a discussion concerning both money that Hamilton owed the [petitioner] and a gun of the [petitioner's] that he had given to Hamilton approximately two weeks earlier. Also present during the conversation were the victim, and McWarren St. Julien. The [petitioner] also questioned the victim about the whereabouts of the gun. During the conversation, the [petitioner] became upset, began yelling and pulled out a Glock .40 handgun. Police officers subsequently came to the location of the conversation, but when they arrived the [petitioner] was no longer there. Later that night, Hamilton called the [petitioner] to attempt to explain that he did not know where the gun was located, and that he would never steal from the [petitioner]. The [petitioner] told Hamilton that he wanted him 'to get everything straight.'

"On the following day, May 11, 1996, Hamilton again called the [petitioner], who told Hamilton that he was going to meet Hamilton . . . and that the two men would go together to find the victim to learn what had happened to the gun. Later that evening, the [petitioner] picked up Hamilton and they proceeded to 244 Olive Street in Bridgeport, where Hamilton [and] the victim . . . lived. At 244 Olive Street, the [petitioner], the victim, St. Julien [and] Hamilton . . . were on the front porch of the house. There the [petitioner] asked the victim about the whereabouts of his gun that had been the topic of the May 10 discussion. At or about the same time, Rodolphe St. Victor arrived at the house. The [petitioner] and St. Julien then left the porch as St. Victor forcibly pulled the victim off the porch. As the [petitioner] and St. Julien proceeded to enter a blue Oldsmobile parked in the driveway of the house, St.

Victor grabbed the victim by the sleeve and said 'Come on. [The petitioner] wants to talk to you.' St. Victor then forced the victim into the Oldsmobile, which the [petitioner] then drove away. . . .[14]

"Later that evening, the [petitioner], St. Julien and St. Victor returned to 244 Olive Street in the blue Oldsmobile. The police arrived shortly thereafter and arrested the three occupants of the vehicle and recovered a gun from it.[15] The [petitioner], St. Julien and St. Victor then were taken to the Bridgeport police station. . . . St. Victor directed the police to Suggetts Lane, Bridgeport, where the victim was found, conscious but unable to speak, with a gunshot wound to the back of his neck. The police summoned medical personnel, who took the victim to Bridgeport Hospital, where he died. Tests conducted on the gun recovered from the car revealed that the bullet that killed the victim had been fired from it. The murder weapon was a Mac-10 automatic pistol modified with a shell catcher to retain spent bullet casings and a handle to prevent shaking when the gun was fired rapidly. This weapon belonged to the [petitioner], and he often carried it with him." (Footnotes added.) *State* v. *Cator*, supra, 256 Conn. 789–91. With the foregoing facts and legal principles in mind, we now turn to the merits of the petitioner's claims.

1

We first address the petitioner's claim that "appellate counsel [rendered deficient performance] when she failed to appeal the murder and conspiracy to commit murder charges being submitted to the jury and the insufficient evidence to sustain [those convictions]." Specifically, he contends that the state failed to prove the element of intent required for those convictions. The crux of the petitioner's argument is that his convictions for murder as an accessory and conspiracy to commit murder cannot stand because they are logically inconsistent with the trial court's granting his motion for a judgment of acquittal with respect to the capital felony charge.[16] The petitioner further argues that "[a]ppellate counsel's failure to pursue this claim on appeal was not based on reasonable strategy, but on an ignorance of the applicable principles of law and a misreading [of] the trial court's decision." In response, the respondent contends that despite appellate counsel's "misperception of the law regarding capital felony, she did not perform deficiently on this ground given its underlying lack of merit." We agree with the respondent and, accordingly, conclude that because there was sufficient evidence adduced at trial to prove that the petitioner was guilty of murder as an accessory and conspiracy to commit murder, appellate counsel acted reasonably by not raising an insufficiency claim in the petitioner's direct criminal appeal.

The following legal principles are necessary to our resolution of these claims. To establish the petitioner's

guilt with respect to the offense of murder as an accessory under §§ 53a-54a and 53a-8 (a), the state was required to prove that: (1) a murder was committed; see footnote 11 of this opinion; (2) the petitioner had the intent to cause the death of the victim; see, e.g., *State* v. *Otto*, 305 Conn. 51, 66–67, 43 A.3d 629 (2012); and (3) the petitioner "solicit[ed], request[ed], command[ed], importune[ed] or intentionally aid[ed]" in the commission of the murder. General Statutes § 53a-8 (a). "[A] conviction under § 53a-8 requires [the state to prove the petitioner's] dual intent, [first], that the accessory have the intent to aid the principal and [second] that in so aiding he intend to commit the offense with which he is charged." (Internal quotation marks omitted.) *State* v. *Danforth*, 315 Conn. 518, 529, 108 A.3d 1060 (2015).

The crime of conspiracy is codified at § 53a-48.[17] To establish the petitioner's guilt with respect to this offense, "the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy . . . . The state must also show intent on the part of the [petitioner] that conduct constituting a crime be performed. . . . The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . .

"Because of the secret nature of conspiracies, a conviction usually is based on circumstantial evidence. . . . Consequently, it is not necessary to establish that the [petitioner] and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Citations omitted; internal quotation marks omitted.) *State* v. *Taft*, 306 Conn. 749, 756–57, 51 A.3d 988 (2012); see also *State* v. *Taylor*, 177 Conn. App. 18, 31–32, 171 A.3d 1061 (2017), cert. denied, 327 Conn. 998, 176 A.3d 555 (2018).

The record indicates that the jury reasonably could have found that: (1) The petitioner was angered by the disappearance of a gun that he had lent to Hamilton; (2) St. Victor forced the victim into the petitioner's vehicle, which the petitioner then drove away; (3) in a sworn statement to Bridgeport police, the petitioner admitted to picking up Johnson after leaving the victim's residence; (4) the petitioner further stated that "[they] went for a ride . . . and [they] got to some street and someone said stop. When [he] stopped . . . [the victim and Johnson] got out"; (5) the petitioner heard one gunshot and Johnson got back into the vehicle holding a "little mini uzzi"; (6) the petitioner then

returned to the victim's residence where he, St. Julien and St. Victor were apprehended by police; (7) Johnson exited the petitioner's vehicle and entered the residence; and (8) ballistics testing revealed that the victim was fatally shot in the back of the neck with the petitioner's Mac-10, which was recovered from the vehicle.

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence to prove that the petitioner was guilty of murder as an accessory and conspiracy to commit murder. Accordingly, the habeas court properly denied this claim because the petitioner failed to demonstrate that his appellate counsel rendered deficient performance by failing to challenge the sufficiency of the evidence supporting these convictions.

2

We next address the petitioner's claim that appellate counsel rendered deficient performance by failing to raise a claim of insufficient evidence with respect to the charge of felony murder. Specifically, the petitioner argues that the evidence adduced at trial failed to establish that Johnson, the victim's alleged shooter, was a participant in the kidnapping of the victim, or shot the victim in furtherance of the kidnapping. The respondent, in turn, argues that, "[v]iewing the evidence in the manner most supportive of the jury's verdict . . . the jury may reasonably have found a relationship between the ongoing abduction of the victim and the ultimate homicide beyond that of mere causation." We agree with the respondent.

The crime of felony murder is codified at § 53a-54c.[18] "In order to obtain a conviction for felony murder the state must prove, beyond a reasonable doubt, all the elements of the statutorily designated underlying felony [in this case, kidnapping in the second degree] and in addition, that a death was caused in the course of and in furtherance of that felony. . . . There is no requirement that the state prove an intent to cause death." (Internal quotation marks omitted.) *Ramos* v. *Commissioner of Correction*, 172 Conn. App. 282, 318, 159 A.3d 1174, cert. denied, 327 Conn. 904, 170 A.3d 1 (2017). "Kidnapping is a continuing crime. . . . Because kidnapping involves interfering with the victim's liberty, it continues until that liberty is restored." (Citations omitted.) *State* v. *Gomez*, 225 Conn. 347, 351, 622 A.2d 1014 (1993); see also *State* v. *Crenshaw*, 313 Conn. 69, 93, 95 A.3d 1113 (2014).

At the habeas trial, appellate counsel testified that she did not raise this issue on appeal because there was sufficient evidence to prove the petitioner's guilt with respect to felony murder. The petitioner's experts *agreed* with that position. Pattis opined that "[he did] not see the significance of the Johnson issue because . . . the [victim] together with the [petitioner] and

some colleagues got in a car. At some point that . . . car picked up [Johnson]. If [Johnson] wasn't present when the kidnapping began, [it was] not at all apparent to [him] that [Johnson] wasn't recruited or didn't come on the scene as that continuing course of conduct evolved and from the standpoint of [the petitioner, he did not] see the benefit to him of Johnson being a late arrival in an ongoing course of conduct." Similarly, Taylor opined that "[he] did not believe that . . . a reasonable appellate attorney would be required to raise [this] issue or risk being found to have provided ineffective assistance."

Viewing the evidence in the light most favorable to sustaining the verdict, we agree with the habeas court's conclusion that "[t]he jury could logically and reasonably infer that, during the victim's abduction by the petitioner, the petitioner picked up [Johnson] and supplied him with the firearm used to kill the victim." We therefore conclude that the habeas court properly denied this claim because the petitioner failed to demonstrate that his appellate counsel rendered deficient performance.

### III

Last, we address the petitioner's claim that his due process rights were violated when the trial court erroneously instructed the jury with respect to intent. Specifically, the petitioner claims that the habeas court improperly concluded that this claim was procedurally defaulted. In response, the respondent argues that the petitioner "failed to bear his burden of proving both good cause and actual prejudice to excuse his procedural default of this claim." We agree with the respondent.

The following legal principles are necessary to our resolution of this claim. "Our review of a determination of the application of [the procedural default doctrine] involves a question of law over which our review is plenary. . . . Under the procedural default doctrine, a claimant may not raise, in a collateral proceeding, claims that he could have made at trial or on direct appeal in the original proceeding, unless he can prove that his default by failure to do so should be excused. . . .

"The cause and prejudice standard [of reviewability] is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, [inadvertence] or ignorance . . . . In order to satisfy this standard, the [habeas] petitioner must demonstrate *both* good cause for failing to raise a claim at trial or on direct appeal and actual prejudice from the underlying impropriety. . . . [T]he existence of cause for a procedural default must ordinarily turn on whether the [petitioner] can show that some objective factor external to the defense

impeded counsel's efforts to comply with the [s]tate's procedural rule. . . .

"With respect to the actual prejudice prong, [t]he habeas petitioner must show not merely that the errors at . . . trial created the possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions. . . . Such a showing of pervasive actual prejudice can hardly be thought to constitute anything other than a showing that the prisoner was denied fundamental fairness at trial. . . . [A] habeas petitioner's showing of ineffective assistance of counsel demonstrates such actual prejudice." (Citations omitted; emphasis added and omitted; internal quotation marks omitted.) *Arroyo* v. *Commissioner of Correction*, 172 Conn. App. 442, 461–62, 160 A.3d 425, cert. denied, 326 Conn. 921, 169 A.3d 235 (2017); see generally *Jackson* v. *Commissioner of Correction*, 227 Conn. 124, 629 A.2d 413 (1993). "Cause and prejudice must be established conjunctively. . . . If the petitioner fails to demonstrate either one, a trial court will not review the merits of his habeas claim." (Internal quotation marks omitted.) *Sinchak* v. *Commissioner of Correction*, 173 Conn. App. 352, 366, 163 A.3d 1208, cert. denied, 327 Conn. 901, 169 A.3d 796 (2017).

As we previously concluded in part II A of this opinion, the habeas court properly determined that the petitioner failed to establish that his appellate counsel rendered ineffective assistance by not raising the instructional impropriety claim on direct appeal. The petitioner, accordingly, has failed to satisfy the good cause prong under the curative standard because, as we have determined, the claim was not raised pursuant to a reasonable strategy. We therefore conclude that the habeas court properly determined that the petitioner's due process claim was subject to procedural default and that the petitioner failed to demonstrate both good cause and actual prejudice to excuse his procedural default of this claim.

For the reasons set forth previously, we conclude that the petitioner failed to establish that the issues raised on appeal are debatable among jurists of reason, that a court could resolve the issues in a different manner or that the questions raised deserve encouragement to proceed further. Accordingly, the habeas court did not abuse its discretion in denying the petition for certification to appeal.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] On August 22, 2001, the petitioner filed his first petition for a writ of habeas corpus, thereafter amended on November 23, 2003, in which he alleged the ineffective assistance of his trial counsel and actual innocence. See *Cator* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-01-0810396-S, 2004 WL 503831 (February 25, 2004). After a trial, the habeas court denied the petitioner's amended petition for a writ of habeas corpus in a written memorandum of decision and denied his petition for

certification to appeal. See id. This court subsequently dismissed the petitioner's appeal. See *Cator* v. *Commissioner of Correction*, 92 Conn. App. 241, 884 A.2d 447 (2005), cert. denied, 276 Conn. 936, 891 A.2d 1 (2006).

On October 30, 2006, the petitioner filed a second petition for a writ of habeas corpus in which he requested that his right to petition for a new trial be restored. Specifically, the petitioner sought a new trial in light of the acquittal of Peter Johnson, who was charged with murder as principal in connection with the victim's death. See *Cator* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-06-4001410-S, 2009 WL 765395 (February 19, 2009). After a trial, the habeas court denied the petitioner's petition for a writ of habeas corpus and petition for certification to appeal.

On November 2, 2010, the petitioner filed his third petition for a writ of habeas corpus, thereafter amended on November 13, 2012, in which he alleged the ineffective assistance of his second habeas counsel. See *Cator* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-10-4003845-S. That petition was withdrawn on March 21, 2013. See id.

The petitioner filed his fifth petition for a writ of habeas corpus on June 12, 2017. See *Cator* v. *Commissioner of Correction*, Superior Court, judicial district of Tolland, Docket No. CV-17-4008872-S (June 12, 2017). That action remains pending before the habeas court.

[2] We note that the petitioner's direct appeal occurred prior to our Supreme Court's decision in *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), in which it held that "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." Id., 482–83; see also *State* v. *Bellamy*, 323 Conn. 400, 147 A.3d 655 (2016).

[3] "The plain error doctrine is based on Practice Book § 60-5, which provides in relevant part: The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . . The plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under [the] plain error [doctrine] unless [he] has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Vega*, 128 Conn. App. 20, 29 n.3, 17 A.3d 1060, cert. denied, 301 Conn. 919, 21 A.3d 463 (2011).

[4] See *State* v. *Pond*, 315 Conn. 451, 467–68, 108 A.3d 1083 (2015) ("[c]onspiracy . . . is a specific intent crime, with the intent divided into two elements: [1] the intent to agree or conspire and [2] the intent to commit the offense which is the object of the conspiracy" [internal quotation marks omitted]); *State* v. *Franko*, 142 Conn. App. 451, 460, 64 A.3d 807 (2005) ("kidnapping in the second degree . . . is a specific intent crime"), cert. denied, 310 Conn. 901, 75 A.3d 30 (2013); *State* v. *Rivet*, 99 Conn. App. 230, 231 n.1, 912 A.2d 1103 ("[m]urder is a specific intent crime"), cert. denied, 281 Conn. 923, 918 A.2d 274 (2007).

[5] See, e.g., *State* v. *Montanez*, supra, 277 Conn. 745–47; *State* v. *Austin*, 244 Conn. 226, 710 A.2d 732 (1998); *State* v. *Prioleau*, 235 Conn. 274, 322, 664 A.2d 743 (1995); *Salters* v. *Commissioner of Correction*, supra, 175 Conn. App. 821–22; *Barlow* v. *Commissioner of Correction*, 131 Conn. App. 90, 26 A.3d 123, cert. denied, 302 Conn. 937, 28 A.3d 989 (2011); *Moody* v. *Commissioner of Correction*, 127 Conn. App. 293, 14 A.3d 408, cert. denied, 300 Conn. 943, 17 A.3d 478 (2011); *State* v. *Young*, 68 Conn. App. 10, 791 A.2d 581, cert. denied, 260 Conn. 909, 795 A.2d 547 (2002).

[6] See also *State* v. *Sivak*, 84 Conn. App. 105, 112–13, 852 A.2d 812 (reasonably possible jury was misled by improper intent instruction that included full statutory definition of "intentionally" and focused on intended conduct rather than intended result of causing serious physical harm), cert. denied, 271 Conn. 916, 859 A.2d 573 (2004); *State* v. *Lopes*, 78 Conn. App. 264, 270–72, 826 A.2d 1238 (reasonably possible jury was misled where "improper instruction was given in regard to the definition of murder and not solely in the instruction dealing with the general definition of intent," and this court "[did] not observe numerous proper instructions that would overshadow the improper 'engaging in conduct' language"), cert. denied, 266 Conn. 902, 832 A.2d 66 (2003).

[7] The court instructed in relevant part: "Now, I defined intent [on Friday], I will do it today because it has—it has to be present in your mind and understanding. I want it fresh. . . .

"A person acts intentionally with respect to—to a result or to conduct described by the statute defining an offense when his conscious objective is to cause such a result or to engage in such conduct. Intentional conduct is purposeful conduct rather than conduct that is accidental or inadvertent. . . .

"[A] person's intention may be inferred from his conduct. You may infer from the fact that an accused engaged in conduct that he intended to engage in that conduct. An intent to cause death may be inferred from circumstantial evidence, such as the type of weapon used, the manner in which it is used, the type of wounds inflicted, the events leading to it, immediately following the death."

[8] The court further charged the jury: "[A]n accused person, acting with the mental state required for the commission of an offense, who solicits, requests, commands, importunes, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct, and may be prosecuted and punished as if he were the principal offender. If a person did any of these things specified in the statute, he is in the eyes of the law just as guilty of the crime charged as though he had directly committed it or directly participated in its commission; that is, solicits, requests, commands, importunes, or intentionally aids another person to engage in conduct which constitutes an offense."

[9] General Statutes § 53a-94 (a) provides: "A person is guilty of kidnapping in the second degree when he abducts another person."

[10] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

"[T]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. . . . Because direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Internal quotation marks omitted.) *State* v. *Gill*, 178 Conn. App. 43, 48–49, 173 A.3d 998, cert. denied, 327 Conn. 987, 175 A.3d 44 (2017); see also *State* v. *Otto*, 305 Conn. 51, 66–67, 43 A.3d 629 (2012).

[11] The court's supplemental intent instruction provided in relevant part: "Intent relates to the condition of mind of the person who commits the act; his purpose in doing it. As defined by our statute, a person acts 'intentionally' with respect to a result or to conduct when his conscious objective is to cause such result or to engage in such conduct.

"What a person's purpose, intention or knowledge has been is usually a matter to be determined by inference. No person is able to testify that he looked into another's mind and saw therein a certain purpose or intention or a certain knowledge to do harm to another. The only way in which a jury can ordinarily determine what a person's purpose, intention, or knowledge was, at any given time, aside from that person's own statements or testimony, is by determining what that person's conduct was and what the circumstances were surrounding that conduct, and from that infer what his purpose, intention, or knowledge was."

[12] The habeas court subsequently requested Taylor to clarify this testimony, specifically asking: "On the question of . . . the overly broad intent instruction, I want to make sure I understood what you said, that the judge clearly gave . . . an intent definition that didn't apply in the case, but you also said that on the specific [charges] he gave the specific intent, which was restricted to the proper scope. Am I getting what you said correctly?" Taylor replied: "Yes, Your Honor."

[13] Likewise, because the trial court *repeatedly* instructed the jury as to the intent required under the charged offenses, there is no manifest injustice that warrants reversal pursuant to the plain error doctrine. See *State* v. *Jaynes*, 36 Conn. App. 417, 430, 650 A.2d 1261 (1994), cert. denied, 233 Conn. 908, 658 A.2d 980 (1995).

[14] After leaving 244 Olive Street, the petitioner picked up Johnson at

[Waldbaum's] Market by James Street and "went for a ride by Stratford Avenue . . . ." At some point, the petitioner stopped the vehicle and the victim and Johnson exited and "talk[ed] for a while . . . ." A single gunshot rang out and Johnson reentered the vehicle holding a "little mini uzzi."

[15] When the blue Oldsmobile returned to 244 Olive Street, Johnson immediately "jumped out of the car and went into the house." Johnson subsequently exited the house through the back door and was not apprehended by Bridgeport police at that time.

[16] As the habeas court correctly stated in its memorandum of decision: "[T]he critical issue was not whether [the court's] denial of the motion [for a judgment of acquittal] as to most counts was inconsistent with [the court's] granting of the motion as to capital felony murder, but rather whether [the court] correctly determined that there existed sufficient evidence to support the other charges, despite the fact that the petitioner was not the shooter himself." (Emphasis omitted.)

The trial court's granting of the petitioner's motion for a judgment of acquittal with respect to the capital felony charge does not implicate our analysis as to the sufficiency of the evidence underlying the petitioner's convictions for murder and conspiracy to commit murder.

"Practice Book §§ 42-40, 42-41 and 42-42 . . . govern motions for judgments of acquittal. Those provisions provide, among other things, that, '[a]fter the close of the prosecution's case in chief or at the close of all the evidence, upon motion of the defendant or upon its own motion, the judicial authority shall order the entry of a judgment of acquittal as to any principal offense charged . . . for which the evidence would not reasonably permit a finding of guilty.' . . . Practice Book § 42-40. Although . . . that language means that the trial court is obliged to grant a motion for a judgment of acquittal should a proper circumstance present itself, the rule sheds no light on how this court is required to review the sufficiency of the evidence following the trial court's denial of such a motion and a jury's verdict of guilty. There undoubtedly will be situations in which reasonable minds could differ regarding whether the particular facts at the close of the state's case could support a verdict of guilty, but once a case is submitted to a jury, however erroneously, and the jury returns a verdict of guilty, review of the evidence ought to be on the basis of that evidence that was before the jury. . . . After all, on an appeal claiming insufficiency of the evidence following a jury's verdict of guilty, *it is the propriety of the jury's verdict that we are reviewing, not the propriety of the trial court's submission of the case to the jury.*" (Citation omitted; emphasis added and omitted; footnotes omitted.) *State* v. *Perkins*, 271 Conn. 218, 239–41, 856 A.2d 917 (2004).

[17] General Statutes § 53a-48 provides in relevant part: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ."

[18] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder, when acting either alone or with one or more persons, such person commits or attempts to commit . . . kidnapping . . . and, in the course of and in furtherance of such crime or of flight therefrom, such person, or another participant, if any, causes the death of a person other than one of the participants . . . ."

───────────────